**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | **:** | **CRIMINAL NO. 12-182(RWR)** |
| | **:** | |
| **v.** | **:** | |
| | **:** | |
| **FLOYD LEE CORKINS, II,** | **:** | |
| | **:** | |
| **Defendant.** | **:** | |

### GOVERNMENT'S SENTENCING MEMORANDUM

FBI Agent:      [W]hat was your intention . . . You're . . . a political activist you said?

**Corkins:      Yeah, I wanted to kill the people in the building and then smear a Chicken-fil-A sandwich on their face**

\*          \*          \*

FBI Agent:      And you, what was your intention when you went in there with the gun?

**Corkins:      Uh, it was to kill as many people as I could.**

\*          \*          \*

On August 15, 2012, a mass killing of innocent civilians at work in our nation's capital was narrowly averted.   The defendant, the lone gunman and perpetrator of this attempted massacre, had the malicious intent and engaged in the requisite planning and effort necessary to achieve his purpose.   Fortunately, he was thwarted by the heroic intervening actions of Leonardo Johnson, a building manager/security guard who was seriously injured as a result.   Although the defendant largely failed to bring about the violence he sought, he was still able to accomplish one of his objectives—that is, to use acts of violence to terrorize and intimidate those within the District of Columbia and the United States who did not share his political beliefs and views.

On February 6, 2013, faced with the overwhelming evidence of his crimes, the defendant

pled guilty to Act of Terrorism while Armed (Count IV), Assault with Intent to Kill while Armed as to Mr. Johnson (Count II), and Interstate Transportation of a Firearm and Ammunition (Count I).   The defendant's crimes are serious and warrant severe sentences—not only to punish the defendant for his actions, but to keep the community safe from him and deter other would-be mass murderers and domestic terrorists from following suit.   Accordingly, the Government respectfully requests that the Court sentence the defendant to a combined term of imprisonment of 45 years.

## Facts Relevant to Sentencing – Statement of Offense

By virtue of the Statement of Offense in support of his guilty plea, the defendant acknowledged the following facts:

## Introduction

On August 15, 2012, the defendant Floyd Lee Corkins, II (hereinafter "Corkins" or "the defendant"), armed with a loaded semi-automatic pistol he had purchased in Virginia, two additional loaded magazines, and a box of ammunition, traveled from Virginia to the office headquarters of the Family Research Council ("FRC") in Washington, D.C., intending to shoot and kill as many employees of the organization that he could.   The FRC is a nationally-recognized conservative lobbying group that, according to its own mission statement, "shapes the public debate and formulates public policy that values human life and upholds the institutions of marriage and the family."   Among other things, the FRC advocates against governmental recognition of gay marriage.   When the defendant arrived at the FRC, Leonardo Johnson, a building manager and unarmed security guard seated at the receptionist desk in the first-floor lobby, asked to see the defendant's identification.   Corkins reached into his backpack, pulled out the handgun, and pointed it at Johnson.   Johnson charged Corkins and a struggle ensued, during which Corkins shot Johnson in the arm.   Despite the serious gunshot injury he sustained, Johnson managed to wrestle

2

the gun away from Corkins and then subdued him at gunpoint until members of the D.C.

Metropolitan Police Department ("MPD") arrived.   While on the scene, Corkins told Johnson in

sum and substance that "it was not about you [Johnson]," but about the FRC and its policies.

<u>The Shooting</u>

On the morning of August 15, 2012, the defendant drove his family's car from Herndon,

Virginia, to the East Falls Church Metro Station and took Metro rail into the District of Columbia

with the intent of committing the shooting.   After getting off the train at the Gallery Place Metro

stop, he loaded a Sig Sauer P229 semiautomatic pistol he had purchased in Virginia six days

earlier and walked to the FRC's headquarters, located at 801 G Street, NW, Washington, D.C.

At approximately 10:46 A.M., the defendant arrived in front of the FRC's secured front

door.   To gain access to the building, he falsely told Johnson, who was manning the lobby's

receptionist desk at the time, that he was there for an interview as a prospective intern.   Upon

gaining entry, the defendant approached the receptionist desk and Johnson, and shortly thereafter

attempted to shoot and kill him.

Three FRC security cameras captured the shooting incident, almost in its entirety.   An

exterior FRC security camera captured Corkins entering the front door of the FRC.   A second

camera positioned inside the lobby captured Corkins approaching the front reception desk, behind

which Johnson was seated.   The two men engaged in a brief verbal exchange while Corkins stood

directly in front of the waist-high desk.   After Johnson asked to see the defendant's identification,

Corkins unshouldered his backpack, set it down on the floor in front of the desk, and bent down to

retrieve something from inside it.   Meanwhile, Johnson stood up and moved to one side of the

desk.   Shortly thereafter, Corkins stood back up and leveled his pistol at Johnson's head/upper

body, prompting Johnson to duck and then lunge for Corkins and the gun.   Before Corkins could

fire an initial shot, Johnson grabbed Corkins, and the two men struggled.   During this struggle, Corkins fired his pistol three times, one shot of which struck Johnson in the left forearm area. Despite the gunshot wound and Corkins's subsequent discharges of the gun, Johnson succeeded over the course of the next 15-20 seconds in disarming Corkins and forcing him to the ground and onto his belly.   Johnson then stood over Corkins, subduing him with the weapon.   Around this same time, Corkins stated to Johnson in sum and substance, "It's not about you," it's about the FRC and its policies.

Moments later, another FRC employee in the lobby area at the time of the shooting used the front receptionist desk phone to call 911.[1]   MPD officers in the vicinity responded to the FRC to find Johnson still holding Corkins at gunpoint.   The MPD officers subsequently handcuffed and frisked Corkins on the scene.   In a search of his person, the MPD officers discovered two fully loaded magazine clips (15 rounds each) in one of Corkins's front pants pockets, as well as a Metro card and a handwritten list.   The handwritten list contained the names of four organizations, beginning with the FRC (and its D.C. street address), as well as the address for the Blue Ridge Arsenal in Virginia where Corkins had purchased the gun and other implements (described more fully below).   Each of the four listed organizations are nationally recognized advocacy groups that openly identify themselves as having socially conservative agendas supporting, among other things, legislation defining "marriage" as a relationship between one man and one woman and generally against legislation that would promote gay marriage.   While on the scene, various MPD officers also overheard Corkins make several statements, the sum and substance of which included, "I don't like the organization and what it stands for" and "I don't like these people, and I

---

[1]   A third camera captured this employee's movements during the shooting incident.   After hearing the first shot, the employee scrambled to the floor and remained there to escape physical harm until Johnson had effectively subdued Corkins.

don't like what they stand for."

After securing the scene, MPD officers transported Corkins to the Federal Bureau of Investigations' Washington Field Office ("FBI's WFO") to be processed for arrest and interviewed.   Simultaneously, Johnson was taken by ambulance to Howard University Hospital's Emergency Room to treat his gunshot wound.[2]   MPD officers also called for the MPD's Bomb Unit to inspect Corkins's backpack still on the scene.   An MPD bomb technician physically examined the bag and its contents and found, among other items, a box of 50 rounds of 9mm ammunition that was compatible for use in the semi-automatic pistol and 15 individually-wrapped Chick-fil-A chicken sandwiches.[3]   MPD officers also recovered 3 spent 9mm cartridge casings from the crime scene.

## The Defendant's Post-arrest Statements

At the FBI's WFO, two FBI agents booked Corkins and asked him a number of "public safety" questions.   Afterwards, Corkins was advised of and waived his <u>Miranda</u> rights, and gave a videotaped statement to two other FBI agents.   In his statement, Corkins provided a clear and detailed account of the facts and circumstances relevant to the shooting incident, including acknowledging that:   (1) he intended to enter the FRC that day to kill as many people as possible

---

[2]   Johnson suffered a serious gunshot wound.   After being shot and subduing Corkins, Johnson experienced intense pain while waiting for emergency medical personnel to arrive on the scene.   After being transported to the hospital, he underwent emergency surgery to treat multiple "comminuted fractures" of his left radius and ulna–the two main bones in Johnson's left forearm were effectively "splintered or crushed" in multiple places.   To treat these injuries, a surgeon inserted two metal plates into Johnson's left forearm to allow the shattered bones to heal.   The gunshot caused Johnson to suffer soft tissue injuries and numerous bullet fragments remain in Johnson's arms permanently, as it was impractical to remove each and every one of them during surgery.   Johnson remained in the hospital for approximately a week.   Johnson's arm remained in a cast for several months, and he was unable to work during this time.   Depending on how his bones heal, Johnson may have to undergo a bone graft.   He is currently undergoing physical therapy.

[3]   Although not included in the Statement of Offense, it should be noted that during this time, the fast-food chain Chick-fil-A was the focus of controversy regarding same-sex marriage in the wake of public comments by its president that marriage should be defined as between a man and a woman.   Advocates of gay marriage called for a boycott, while those against gay marriage, like FRC, rallied in support of Chick-fil-A.

and smother Chick-fil-A sandwiches in their faces; (2) he intended to kill the "guard" who

confronted him in the lobby (i.e., Johnson); and (3) he had taken substantial steps in the preceding

week in furtherance of carrying out the crimes.   Among other things, Corkins made the following

statements in sum and substance:

- The night before the shooting, he loaded three magazines with the plan to go to the FRC the next day and "basically opening fire."

- The night before the shooting, he received firearms training from Blue Ridge Arsenal in Chantilly, Virginia, where he had purchased the gun the week before.

- The day before the shooting, he went to a Chick-fil-A and purchased 15 chicken sandwiches with the intent of smearing them in the faces of his shooting victims "to make a statement against the people who work in that building . . . and with their stance against gay rights and Chick Fil-A.   They endorse Chick-fil-A and also Chick-fil-A came out against gay marriage so I was going to use that as a statement."

- Once inside the FRC on the day of the shooting, he pulled the gun on the "guard," grappled with him, and in the course of doing so, he intentionally discharged the gun multiple times; the shooting was not an accident.

- He pointed the gun at the guard, and that he intended to shoot and kill the guard, and then go upstairs and shoot and kill "as many people as [he] could."

- He was a political activist and considered the FRC a lobbying group.   He committed the shooting for political reasons.   He had identified the FRC as an anti-gay organization on the Southern Poverty Law Center website.

- He had been thinking about perpetrating similar violence for years but just never went through with it.

- He purchased the gun the Friday before the shooting from Blue Ridge Arsenal.

- He converted the pistol from a 20-caliber to a 9mm pistol to "be more effective."

- If the police had not responded and caught him at the FRC, he planned to go directly to the second organization on his list and perpetrate a similar shooting there.

- He surveilled the FRC two days before the shooting.

- He initially wanted to make a bomb but did not have the patience to do it.

Consistent with Corkins's statement, the FBI's subsequent investigation confirmed that the defendant did not act impulsively in committing the shooting.   Rather, in the week before the shooting, the defendant methodically planned it by: (1) purchasing the firearm, (2) researching and surveilling his intended targets, (3) receiving firearms training, and (4) purchasing and employing other implements of the crimes.

The Gun Purchase

On Thursday, August 9, 2012, Corkins went to the Blue Ridge Arsenal in Chantilly, Virginia, to purchase a firearm.   He looked at different pistols and ultimately decided to purchase the Sig Sauer P229 semiautomatic pistol, which he had converted from a 22-caliber to a 9 mm firearm.   While there, a French television correspondent and her camera crew doing a piece on the ease with which firearms can be purchased in the United States filmed Corkins holding and pointing the P229 pistol, as well as identifying it by make and model to the correspondent. Corkins left and returned the next day, Friday, August 10, to pick up the pistol.

The Selection and Surveillance of the FRC and Other Targets

Consistent with his statement to the FBI, a subsequent search of Corkins's family computer revealed that on the afternoon of Sunday, August 12, Corkins used the computer to visit the Southern Poverty Law Center's website, as well as the websites for the FRC and the second organization on his handwritten list.   The FBI later recovered from Corkins's home several printed Mapquest and Google maps, dated August 12, 2012, for directions to the FRC and the second organization, as well as the pad of stationary paper used by Corkins to create his handwritten list of targets.

On the afternoon of Monday, August 13, Corkins rehearsed his planned trip to the FRC.

7

He drove his parents' car to the East Falls Church Metro stop, boarded the Metro train for downtown D.C., got off at the Gallery Place Metro stop, and walked to the FRC.   Corkins went to the door of the FRC that afternoon, claiming to be there to meet someone, and giving the lobby receptionist, another FRC employee, a fictitious name.   The FRC employee allowed Corkins access to the lobby area, but told him that there was no one in the building by that name after checking the employee directory.   Corkins then left the building.

<u>Obtaining Other Implements of the Planned Crimes at Chick-fil-A and K-mart</u>

On the afternoon of Tuesday, August 14, Corkins went to a Chick-fil-A in Virginia to purchase the 15 chicken sandwiches.   The FBI later recovered from Chick-fil-A a date-and time-stamped video and a store receipt of Corkins's purchase that afternoon.

Shortly after visiting the Chick-fil-A, Corkins went to a nearby K-mart in Virginia and purchased the black backpack he used in carrying out the offense.   The FBI later recovered from K-mart a time-stamped video and a store receipt of Corkins's purchase that afternoon.

<u>The Firearms Training</u>

On Tuesday evening, August 14, Corkins received approximately two hours of firearms training with his newly-acquired pistol at Blue Ridge Arsenal.   The FBI later recovered from Blue Ridge Arsenal a videotaped recording of Corkins engaged in shooting practice at the range that evening.

**<u>Other Evidence Relevant to the Defendant's Intent</u>**

Pursuant to 22 D.C. Code § 3151, et. seq., Assault with Intent to Kill and Attempted Murder are enumerated "Acts of Terrorism" if committed with the requisite intent.   On August 15, 2012, the defendant assaulted Johnson and the FRC with the intent to intimidate or coerce a significant portion of the civilian population of the District of Columbia and/or the United States;

8

namely, any and all individuals associated with or supporting the FRC, like-minded organizations, or otherwise holding beliefs contrary to or advocating against gay marriage.

### Limited Nature of Statement of Offense

As explicitly acknowledged by the defendant, the Statement of Offense proffered at his guilty plea proceeding was not intended to constitute a complete statement of all facts relevant to this case.   Rather, the limited purpose of that proffer was to demonstrate that there existed a sufficient legal basis for the defendant's plea of guilty to the charges of Interstate Transportation of a Firearm and Ammunition, Assault with Intent to Kill while Armed (Leonardo Johnson), and Act of Terrorism while Armed.

### Other Facts Relevant to Sentencing

In conjunction with the factual narrative set forth in the Statement of Offense, the government also asks that the Court consider the following evidence:

| | |
|---|---|
| Exhibit A | FRC Video Footage (including "Clip #1," a compilation from three different FRC cameras, as well as "Clip #2 and Clip #3," extended footage of the two cameras within the lobby area of the FRC) |
| Exhibit B | Still Photographs from FRC Video Footage |
| Exhibit C | Leonardo Johnson's Injuries on August 15, 2012 |
| Exhibit D | Crime Scene Photographs (with annotations) |
| Exhibit E | Items in the Defendant's Wallet (including his "Target List") |
| Exhibit F | Diagram of Crime Scene (with annotations) |
| Exhibit G | X-ray of the Defendant's Backpack (taken by MPD Bomb Squad) |
| Exhibit H | The Defendant's Internet Searches for Blue Ridge Arsenal on August 7, 2012 |
| Exhibit I | French Film Crew's Video Footage of Blue Ridge Arsenal on August 9, |

2012 (showing the defendant shopping for and purchasing the semi-automatic pistol he used in the shooting)

Exhibit J      Still Photographs from French Film Crew's Video Footage of Blue Ridge Arsenal on August 9, 2012

Exhibit K      Gun Purchase Documents (showing that the Defendant purchased the firearm he used in the shooting from Blue Ridge Arsenal on August 9, 2012, and received it on August 10, 2012)

Exhibit L      The Defendant's Internet Searches on FRC and Another Entity on Target List on August 12, 2012

Exhibit M      Additional Evidence that the Defendant Surveilled FRC and Rehearsed His Plan on August 13, 2012

Exhibit N      Chick-fil-A Photographs from August 14, 2012 (showing the Defendant purchasing Chick-fil-A sandwiches brought to FRC)

Exhibit O      K-Mart Video Footage from August 14, 2012 (showing the Defendant purchasing backpack he used in the shooting)

Exhibit P      Still Photographs from K-Mart Video Footage and Receipt from August 14, 2012

Exhibit Q      Video Footage of Firearms Training at Blue Ridge Arsenal on August 14, 2012 (showing the defendant practicing with the firearm he used in the shooting)

Exhibit R      Still Photographs from Video Footage of and Documents from Firearms Training at Blue Ridge Arsenal on August 14, 2012

Exhibit S      East Falls Church Metro Stop Photographs and Record from morning of August 15, 2012 (showing the Defendant taking train to travel into D.C.)

Exhibit T      Photographs of the Defendant after his arrest on August 15, 2012

Exhibit U      Videotaped Statement by the Defendant to the FBI after his Arrest on August 15, 2012 (hereinafter, the "Def.'s Stat.")[4]

---

[4]   The government has muted the sound in limited portions of the defendant's videotaped statement that make reference to personal identifying information of the defendant, his family members, and certain third parties.   Similar redactions appear in the transcript (see Exhibit V).

Exhibit V  Partial Transcript of Videotaped Statement by the Defendant to the FBI after his Arrest on August 15, 2012 (hereinafter, the "Tr. Def.'s Stat.")

Exhibit W  Other Items Discovered in Search of the Defendant's Home (including stationery listing two Internet sites providing information on the making of improvised bombs)

<u>**Argument**</u>

## I.  Introduction

Consistent with the enormity of his crimes and intended consequences, the defendant pled guilty to committing an Act of (Domestic) Terrorism while Armed, Assault with Intent to Kill while Armed as to Mr. Johnson, and Interstate Transportation of a Firearm and Ammunition.   The domestic terrorism and assault charges each carry maximum terms of imprisonment of 30 years, while the related firearms charge carries a maximum term of imprisonment of 10 years.   Based on the following, the Government asks the Court to sentence the defendant to 20 years imprisonment on the Act of Terrorism while Armed charge, 15 years imprisonment on the Assault with Intent to Kill while Armed charge, and 10 years imprisonment on the Interstate Transportation of a Firearm and Ammunition charge, all sentences to run consecutive to one another.   An effective sentence of 45 years imprisonment is warranted because the defendant committed several distinct crimes that targeted multiple victims.   Moreover, such a sentence would appropriately punish the defendant for his actions, keep the community safe from him for the foreseeable future, and deter other would-be domestic terrorists and mass murderers from doing the same.

## II. <u>Legal Standards</u>

### A.  The D.C. Code Offenses – Act of Terrorism while Armed (Count IV) and Assault with the Intent to Kill while Armed   (Count II)

The D.C. Code offenses of Act of Terrorism while Armed and Assault With the Intent to

Kill while Armed each carry a penalty of not less than 5 years or more than 30 years imprisonment. D.C. Code §§ 22-401, 22-3152, 3153, and 4502 (2001 ed.).    Moreover, the D. C. Sentencing Guidelines are entirely voluntary.   Cook v. United States, 932 A.2d 506, 507 (D. C. 2007); District of Columbia Voluntary Sentencing Guidelines (2012) ("D.C.V.S.G.") §1.2.1 ("These guidelines are voluntary.   This means that judges are not required to follow them.   It also means that a lawful sentence cannot be appealed whether or not the judge complies with the guidelines or the procedures recommended in these instructions.")

Although it need not, even if this Court were to consult the D.C.V.S.G. in fashioning the sentences it will impose for the D.C. Code Offenses, the Court should consider other factors particularly relating to the Act of Terrorism while Armed charge.   Fortunately, the planned attempt to commit a mass murder of innocents simply to send a political message is not a common occurrence in the District of Columbia.   As a result, the D.C. Sentencing Commission has not yet specifically considered or assigned an offense level to the Act of Terrorism while Armed charge. The Group Four Offense assigned in the Presentence Report, therefore, is not a product of the Commission's careful deliberation and application of the sentencing factors to the specific offense. Rather, it is derived solely from application of a general residual clause in the D.C.V.S.G.   See D.C.V.S.G., Appendix C and §2.2.8(b) (indicating that because the Commission has not yet ranked the Act of Terrorism while Armed offense, and it carries a statutory maximum penalty of 30 years, it should be treated as a Group Four Offense).

The resulting ranking of the Act of Terrorism while Armed offense as a Group Four Offense is nonsensical in light of the facts of this case and should be rejected.   Namely, the offense of Act of Terrorism while Armed here involved the commission of the underlying offenses

of Attempted Murder and Assault With Intent to Kill while Armed, plus doing so "intend[ing] to (A) Intimidate or coerce a significant portion of the civilian population of: (i) The District of Columbia; or (ii) The United States . . . .").   Although to our knowledge Attempted First Degree Murder has not been charged in the District of Columbia since the inception of the D.C.V.S.G, the D.C.V.S.G. specifically provides that an Attempt Crime of Violence while Armed is the same group offense level as the unarmed completed offense—in this case, an unarmed First Degree Murder, a Group One Offense.   See D.C.V.S.G., Appendix C at C-4 and §2.1.   As such, the Government submits that the Act of Terrorism while Armed offense should also be designated as a Group One Offense.[5]

As calculated by the Probation Office, the defendant's D.C.V.S.G. range for the crime of Assault With Intent to Kill while Armed is 90-180 months and range for the crime of Act of Terrorism while Armed is 48-120 months.   However, if the Court treats the Act of Terrorism while Armed offense as a Group One Offense, then the Act of Terrorism while Armed would have a D.C.V.S.G. sentence recommendation of 360 months.[6]

Separate and apart from the calculated D.C.V.S.G. range for both offenses, the D.C.V.S.G. provides some additional guidance for imposing sentences in circumstances such as this one. First, pursuant to D.C.V.S.G. §5.2.2(4), the Court could depart upward from any recommended sentencing range for Counts Two and Four if it determines that the "crime committed or attempted was substantially premeditated, as evidenced by a high degree of planning or sophistication or planning over an extended period of time."   D.C.V.S.G. §5.2.2(4).   Second, pursuant to

---

[5]  At a minimum, the Act of Terrorism while Armed offense should be designated as the same group offense level as the other underlying felony of Assault with Intent to Kill while Armed.   If treated in this manner, both would carry the D.C.V.S.G. range of 90-180 months.

[6]  The range for a Group One Offense is 360-720 months, but the statutory maximum for the offense is 360 months.

D.C.V.S.G. §6.1, sentences for counts involving multiple victims in one event "must be imposed consecutively."   D.C.V.S.G. §6.1.

Finally, pursuant to the Plea Agreement, the defendant acknowledged that his "entry of a guilty plea to the charged offenses authorizes the sentencing court to impose any sentence, up to and including the statutory maximum sentence, which may be greater than the applicable Guidelines range."   See Plea Agreement at 5.

### B.   The U.S. Code Offense – Interstate Transportation of a Firearm and Ammunition

The U.S. Code offense of Interstate Transportation of a Firearm and Ammunition (hereinafter, the "Firearm Offense") carries a penalty of not more than 10 years.   18 U.S.C. § 924(b).   In United States v. Booker, 543 U.S. 220 (2005), the Supreme Court ruled that the United States Sentencing Guidelines are no longer mandatory.   However, "[a]s a matter of administration and to secure nationwide consistency, the Sentencing Guidelines should be the starting point and the initial benchmark" for determining the defendant's sentence.   Gall v. United States, 552 U.S. 38, 49 (2007).   While, to be sure, "[i]n accord with 18 U.S.C. § 3553(a), the Guidelines, formerly mandatory, now serve as one factor among several courts must consider in determining an appropriate sentence," Kimbrough v. United States, 552 U.S. 85, 91 (2007), it remains the case that "the Commission fills an important institutional role: It has the capacity courts lack to 'base its determinations on empirical data and national experience, guided by a professional staff with appropriate expertise,'" id. at 574 (quoting United States v. Pruitt, 502 F.3d 1154, 1171 (10th Cir. 2007) (McConnell, J., concurring)).   The Supreme Court accordingly recognized that, "[i]n the ordinary case, the Commission's recommendation of a sentencing range will 'reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives.'"   Kimbrough, 552 U.S. at

89 (quoting <u>Rita v. United States</u>, 551 U.S. 338, 350 (2007)).   As one member of this Court has

held, "<u>Booker</u> requires judges to engage in a two-step analysis to determine a reasonable

sentence."   <u>United States v. Doe</u>, 413 F. Supp.2d 87, 90 (D. D.C. 2006) (Bates, J.)

> [A] district court shall first calculate (after making the appropriate findings of fact) the range prescribed by the guidelines.   Then, the court shall consider that range as well as other relevant factors set forth in the guidelines and those factors set forth in [18 U.S.C.] § 3553(a) before imposing sentence.

<u>United States v. Hughes</u>, 401 F.3d 540, 546 (4th Cir. 2005).

When weighing the § 3553(a) factors as part of its calculus of an appropriate sentence, the

Court should consider not only the nature and circumstances of the offense and the history and

characteristics of the defendant, but also the applicable sentencing objectives—that is, that the

sentence: (1) reflect the seriousness of the offense; (2) promote respect for the law; (3) provide just

punishment; (4) afford adequate deterrence; (5) protect the public; and (6) effectively provide the

defendant with needed educational or vocational training and medical care.   <u>See</u> 18 U.S.C. §

3553(a)(1) and (2).   In addition, the sentence should reflect "the need to avoid unwarranted

sentence disparities among defendants with similar records who have been found guilty of similar

conduct."   18 U.S.C. § 3553(a)(6).

The Probation Office has determined—and the government agrees—that the defendant's

total adjusted offense level for the Firearm Offense is 34, his criminal history category is I, and his

sentencing guideline range is 151-188 months.   However, pursuant to 18 U.S.C. § 924(b) and

U.S.S.G. § 5G1.1(a), the statutorily-authorized maximum sentence for the offense (i.e., 120

months) is greater than the minimum recommended guideline sentence of 151 months under the

U.S.S.G.   Therefore, the statutorily-authorized maximum sentence for the offense of 120 months

shall be the guidelines sentence.   Notably, the parties also agreed pursuant to the Plea Agreement

that "solely for the purposes of calculating the applicable range under the U.S.S.G., neither a downward nor upward departure from the Stipulated Guidelines Sentence for Count One set forth above [that is, 120 months] is warranted.   Accordingly, neither party will seek any departure to the Stipulated Guidelines Sentence for Count One, nor will either party suggest that the Court consider such a departure."   See Plea Agreement at 4.

### III.   An Analysis of the Factors Enunciated in 18 U.S.C. § 3553(a) Demonstrates that a Substantial Period of Incarceration Is Warranted

#### A.   The Nature and Circumstances of the Offenses

Without question, on August 15, 2012, the defendant intended to commit a mass killing of innocent civilians.   The defendant's detailed and thoughtful planning of the crimes and near success in carrying them out are sufficient in themselves to establish this disturbing truth. However, the defendant also freely acknowledged as much throughout his statement to the FBI afterwards.   Indeed, but for the courageous acts of Mr. Johnson, who was seriously injured in the shooting, the defendant would have almost certainly succeeded in committing a massacre of epic portions.   The overwhelming evidence in this case establishes that much and more.

#### 1.   The Defendant Intended to Commit Mass Murder

The defendant clearly intended to kill as many people at the FRC as he could on August 15, 2012.   By his own admission, the defendant had been thinking about perpetrating similar violence for years but had just never gone through with it.   Tr. Def.'s Stat. at 9-10.   On that day, the defendant went to the FRC to "basically open[] fire" and kill "as many people as I could."   Tr. Def.'s Stat. at 1, 4, 6, 8.   To do so, he armed himself heavily.   Several days before the shooting, he purchased a P229 Sig Sauer semiautomatic pistol and had it converted to a 9mm pistol to "be more effective."   Tr. Def.'s Stat. at 23.   Upon entering the FRC lobby, the defendant had no less

than 45 rounds of ammunition readily accessible to him—15 rounds loaded in the pistol itself, and

30 more rounds in two additional 15-round magazines in his front pocket—as well as another 50

rounds of ammunition in his backpack.   Once at the front desk, the defendant retrieved the loaded

pistol from his backpack, and pointed it directly at the upper chest and head of Mr. Johnson with

the intent to kill him in order to carry out his evil rampage.   See Exhibits A and B.   Fortunately,

Mr. Johnson had moved closer to the defendant in order to observe his actions.   With the muzzle

of the defendant's gun only inches from Mr. Johnson's face, he reached for the defendant in order

to disarm him.   During the approximately 30-second struggle with Mr. Johnson, the defendant

acted on his well-developed convictions by firing his pistol three times (Tr. Def.'s Stat. at 8, 23),

striking Mr. Johnson once and sending two other errant, yet equally dangerous, shots into the

occupied lobby area.[7]   See generally Exhibit C.   Fortunately, Mr. Johnson, faced with a

life-or-death situation, fought back and succeeded in overpowering the defendant.   Had Mr.

Johnson failed, in all likelihood, numerous people would have lost their lives.   The defendant

acknowledged this afterwards by telling the FBI that he had planned to kill the people at the FRC

and then rub Chick-fil-A sandwiches in their faces as a political "statement" of sorts.   Tr. Def.'s

Stat. at 3-5, 17.   He also told the FBI that if the police had not responded and caught him at the

FRC, he intended to go to the second organization on his target list and perpetrate a similar

shooting there.   Tr. Def.'s Stat. at 11-12.

## 2.      The Defendant Meticulously Planned to Commit Mass Murder

The extent of the defendant's prior planning further underscores his commitment to kill

---

[7] As shown in the videotaped footage of the shooting, another FRC employee was working in the lobby area of the
FRC when the defendant entered the premises that day.   After hearing the first shot, that employee quickly went to the
ground for cover and then proceeded to crawl on his knees and stomach in an effort to escape the danger.

and terrorize those who disagreed with his beliefs.   On August 7, 2012, a full **eight** days before

the shooting, the defendant identified the Blue Ridge Arsenal in Virginia on the Internet as the

place where he would procure the weapon and ammunition to perpetrate his crimes.[8]   See Exhibit

H.   Two days later, on Thursday, August 9, he went shopping there and picked out a

semi-automatic pistol and a 9mm conversion kit.   By coincidence, a French documentary film

crew was also at the Blue Ridge Arsenal at the time and captured the defendant holding and

pointing the P229 pistol he would ultimately purchase.   See Exhibits I and J.   Even a cursory

viewing of the crew's raw footage shows the unassuming and business-like manner in which the

defendant made his selection.   He picked up the gun the very next day, along with his two hours of

free firearms training on the practice range.   See Exhibit K.

According to various accounts, the defendant spent the majority of the weekend interacting

closely with members of his immediate and extended family at gatherings in southwestern

Virginia and North Carolina.   When he arrived home on Sunday, August 12, however, he returned

to his planning.   As indicated above and further established in the attached exhibits, over the next

several days, the defendant: (1) selected multiple organizational targets based on their

publically-held positions on gay marriage and gay rights (Exhibit L); (2) mapped their locations to

facilitate his travel to those locations (Exhibit L); (3) created a consolidated list of these targets,

often noting corresponding addresses (Exhibit E); (4) rehearsed, in its entirety, his planned trip to

the FRC by driving to the East Falls Church Metro stop, taking the Metro train to the Gallery Place

Metro stop, walking to the FRC, and obtaining entry to the controlled lobby area by falsely giving

---

[8]   In explaining his actions to the FBI, the defendant stated that he had been thinking about perpetrating similar violence "probably for years," and had even wanted to make a bomb, but "I didn't have the patience for it."   Def.'s Stat. at [time]; [time].

a fictitious name and claiming to be there to meet someone ("[j]ust basically trying to go over exactly what I was gonna do today" (Tr. Def.'s Stat. at 18; Exhibit M); (5) purchased the 15 Chick-fil-A chicken sandwiches as crude props to accentuate his "political statement" (Tr. Def.'s Stat. at 3-5, 17; Exhibit N); (6) purchased a new backpack to carry and conceal the loaded pistol, the extra ammunition, and the sandwiches while carrying out the offenses (Exhibits O and P); and (7) received approximately two hours of firearms training at Blue Ridge Arsenal and loaded his magazines the night before (Exhibits Q and R).   At almost each step along the way, video cameras captured the quiet and deliberate manner in which the defendant undertook the various tasks.   By observing the defendant's demeanor and interactions with others throughout this planning process, one can readily conclude that the defendant was motivated by a firm resolve and purpose.   Indeed, under any application of the standard, the defendant's crimes were "substantially premeditated, as evidenced by a high degree of planning or sophistication or planning over an extended period of time."   See D.C.V.S.G. §5.2.2(4).

### 3.   Without Remorse or Repentance, the Defendant Used Violence to Advance his Political Cause

Both at the crime scene and later in his statement to the FBI, the defendant made it abundantly clear that he knowingly and unrepentantly embraced violence as a means of garnering attention for his political agenda.   After shooting Mr. Johnson and being subdued, he told Mr. Johnson, "It's not about you," it's about the FRC and its policies.   And yet, the defendant intentionally shot and attempted to kill Mr. Johnson based solely on his apparent association with FRC.

FBI Agent:   And this is so if he [Johnson] didn't grab it from ya, your, was your intention, it was to shoot him?

| Corkins: | I would have shot him. |
|---|---|
| FBI Agent: | And, and it was to kill him? |
| Corkins: | Yes. |

*     *     *

| FBI Agent: | When you guys are struggling with the gun, how did the gun discharge? |
|---|---|
| Corkins: | I pulled the trigger. |
| FBI Agent: | You pulled the trigger?   Okay.   So it wasn't, it wasn't like you guys were struggling around the gun and the trigger just accidentally went off.   You pulled the trigger? |
| Corkins: | Yeah. |

Def.'s Stat. at [time].[9]

While still on the crime scene, several MPD officers overheard the defendant repeat his motivation for the crimes:   "I don't like the organization and what it stands for" and "I don't like these people, and I don't like what they stand for."   <u>See</u> Statement of Offense at 4.   Later, in his statement to the FBI, the defendant reiterated this disturbing justification:

| FBI Agent: | You said you wanted to make a statement. |
|---|---|
| Corkins: | Yeah, it's basically a statement against the people who work in that building. |
| FBI Agent: | Okay. |
| Corkins: | I consider myself a political activist. |
| FBI Agent: | Okay. |
| Corkins: | And with their stance against gay rights and Chicken-fil-A, they endorse |

---

[9] The defendant later stated "I got a few shots off."   Tr. Def.'s Stat. at 23.   When asked how many, he replied, "I'm not sure, maybe around 3."   <u>Id</u>.

> Chicken-fil-A and also Chicken-fil-A [undecipherable] came out against gay marriage . . . so I was going to use that as kind of a statement.

Tr. Def.'s Stat. at 3.

| | |
|---|---|
| FBI Agent: | And then if you would have killed him, what would you, you said, you would have . . . you were trying to . . . |
| Corkins: | I would have gone upstairs.   I wanted to go on the elevator and go upstairs to the office part of the building? |
| FBI Agent: | And do what else? |
| Corkins: | Uh, kill as many people as I could. |

Tr. Def.'s Stat. at 8.

At no time in his statement to the FBI did the defendant exhibit any remorse for the violence and terror he sought to effect at the FRC.   Rather, when asked by the FBI what he thought should happen to him for committing the shooting, the defendant flatly replied, "Nothing." Def.'s Stat. at 1:02:25.

### 4.       The Defendant Seriously Injured Mr. Johnson

Mr. Johnson did not ask to be a hero on August 15, 2012; rather, the defendant forced him to become one.   Fortunately for the other occupants of the FRC building, including another employee working in the lobby area at the time, Mr. Johnson met the threat head on and was ultimately able to overpower a very determined assailant.   But for Mr. Johnson's heroic actions, the defendant would likely have killed or severely injured numerous people in the building that day.   In acting, however, Mr. Johnson suffered a serious gunshot wound, the prolonged loss of the normal use of his arm, the ongoing need for medical attention, and countless other consequences.

In his victim impact statement ("VIS") to the Court, Mr. Johnson aptly summarized the adverse physical, psychological, and emotional impacts the defendant's violent attack has had on

his life.   He has undergone successive surgeries to treat the devastating gunshot injuries to his left

arm, followed by additional emergent care for life-threatening blood clots that formed as a result

and months of "grueling physical therapy sessions."   Psychologically, Mr. Johnson regularly

experiences anger and frustration at how the shooting has either materially inhibited or altogether

ended his ability to perform important features of his job, participate in sports and workout (e.g.,

weightlifting), and consume some of his favorite foods and beverages—all aspects of life that he

once enjoyed immensely.   These feelings are fueled by what, as Mr. Johnson appropriately

describes was "such a senseless crime.   Many innocent people were going to be ruthlessly

murdered and taken away from their families and friends forever with no remorse."

**5.      As the Intended Targets of the Defendant's Armed Attack,
the FRC and its Employees Were Also Victims of Terrorism**

The FRC is a conservative lobbying group that, according to its own mission statement,

seeks to "shape[] the public debate and formulate[] public policy that values human life and

upholds the institutions of marriage and the family."   It is a national non-profit organization with

a staff of approximately 80 individuals, the majority of whom work at the FRC's headquarters

building in Washington, D.C.

When the defendant entered and attacked the FRC headquarters building on August 15,

2012, approximately 50 FRC employees were working inside at the time.   Leonardo Johnson and

one other employee were in the lobby area, while the other FRC employees were working in

dedicated office space on the upper floors of the building—a short elevator ride away.

Ultimately, because Mr. Johnson interceded, many of the FRC employees did not learn about the

attack until after Mr. Johnson had effectively thwarted it in the lobby area.   Nonetheless, in the

minutes, hours, and days to follow they would quickly learn either from their personal

observations or those of others how close and real the danger had been.   In their victim impact

statements, the FRC and its employees describe how this new-found terror—generated by the

defendant's attack on the FRC—has invaded their personal security and otherwise peaceful daily

existences:

> Every day, our staff has to deal with the fact that each of us was a potential victim.
> For those in our DC headquarters, we enter the building, walk past our armed
> security guards who were added after the shooting and pass the desk where Leo was
> shot.   We are grateful for Leo's extraordinary actions, but are pained by his injury
> and pray for his full recovery.   Yet every day many on our team are reminded of
> the attack and relive the trauma.   Our family members are reminded every day that
> they may have lost a family member that day had Leo not intervened.   And their
> worries continue, wondering about further violence.

VIS of FRC at 1.

> On August 15, 2012, my life changed in a way that I would never wish on anyone.
> It was a bright sunny day, and I was on my way to a daily Mass at a nearby church.
> I was not anticipating walking out of an elevator to see the blood of a good friend of
> mine on the back of Mr. Corkins, while he was lying on the floor.   In an instant,
> my sense of security was gone forever. . . .   Mr. Corkins may not realize what he
> did to me that day.   I have experienced nightmares in the days and months that
> followed, as well as the fear I have of certain popping sounds.   The most lasting
> impact is the lack of security I feel on a daily basis, I am angered that this assault
> made me feel like I can never be safe at the office again.

VIS of FRC Staff Member #2 at 1.

> My office—on an upper floor of the FRC headquarters—was far enough away
> from the action that, to be honest, I never even heard the shots that morning.   I
> learned of the shooting only when colleagues appeared at my door and I saw from
> my window the arriving first responders.   I quickly called my wife at home and
> assured her of my safety.   She seemed calm, and, all things considered, appeared
> to absorb the shock of the situation well—or so we thought.   The cracks would be
> masked that day, but would soon reveal themselves in a stress-induced illness that
> would drastically alter the daily life of my family.

VIS of FRC Staff Member #1 at 1.

> Like every day I start my day with the expectation that my peace and personal
> security would be maintained and not be intruded upon.   Yet, on that day those

things and more were abruptly and intrusively shattered.   At that point, my every
day privilege of returning home to family and friends safely were interrupted and
my assurance of the same turned into doubt.

VIS of FRC Staff Member #3 at 1.

In short, while only Mr. Johnson was physically injured, numerous FRC employees

sustained deeper and, arguably, more harmful psychological injuries.   Namely, the persistent fear

caused by knowing that someone had sought to unleash unimaginable carnage upon them solely

because of their deeply-held moral and political beliefs.[10]

### B.    The History and Characteristics of the Offender

The defendant is an intelligent and educated man, who was raised by a loving family.   His

incarceration will no doubt be a hardship on them, and the government sympathizes with their

situation.   There is, however, nothing that indicates that the burden on the defendant's family will

be any different from that of the burden borne by the family of other violent criminals.

According to the Probation Office, the defendant is receiving ongoing mental health

treatment.   In large part, the defendant's attending physicians appear to have treated the defendant

through a combination of prescription medications and periodic counseling sessions.   Although

the defendant appears to suffer from bouts of severe depression and unidentified "psychosis,"

there is absolutely nothing to indicate that the defendant did not fully comprehend what he was

planning and sought to accomplish in the shooting perpetrated at the FRC.   Instead, the detailed

nature of his planning and execution reveal the deliberate and clear-headed manner in which the

defendant acted in this case.

---

[10]    The FRC, as an organization, has detailed the compensatory damages it seeks in the worksheet attached to its
organizational victim impact statement.   The government asks the Court to order the defendant to pay restitution for
all reasonably foreseeable costs to the FRC resulting from his criminal conduct.

In short, the Government submits that the defendant's personal history and his family situation do not present uniquely mitigating circumstances such that they should materially impact his sentence.

### C.      The Need to Promote Respect for the Law, to Provide Just Punishment, to Afford Adequate Deterrence, and to Protect the Public

Imposing a substantial term of imprisonment in this case is absolutely necessary to promote respect for the law, provide just punishment, afford adequate deterrence, and serve to protect the public from the defendant.   Standing alone, the violence the defendant wrought was reprehensible and warrants a significant term of imprisonment.   And yet, his conduct was exponentially more egregious in that he employed violence instead of accepted forms of expression—that is, free speech, peaceful protest, and the democratic process—to advance a political cause.   This was exactly what the D.C. Council was seeking to punish and deter in criminalizing acts of domestic terrorism such as this.

The District of Columbia's Omnibus Anti-Terrorism Act of 2002 defines an Act of Terrorism as "an act or acts that constitute a specified offense [e.g., Assault with Intent to Kill and Attempted Murder] . . . that are intended to (A) intimidate or coerce a significant portion of the civilian population of: (I) The District of Columbia; or (ii) The United States . . . ."   22 D.C. Code § 3152.   There is no case law interpreting or defining "intimidate or coerce a significant portion of the population."   However, the relevant legislative history provides some additional insight into what the D.C. Council meant:

> By "intimidate or coerce" a population, the Committee intends to capture violent acts that are committed with the specific intent of purposely inspiring fear and intimidation among a population, in much the same way Americans have been affected by the September 11, 2001 attacks.   As noted in the beginning of this report, the effects of terrorist crimes reach beyond the immediate victims and their

families to affect broader populations of people.   The purpose of Title I of this legislation is to punish the perpetrators of terrorist crimes who have an agenda that goes beyond the specified offense itself and that perpetuates a broader attempt to intimidate a population or to influence the policy or conduct of government.

By using the term "significant portion of the civilian population," the Committee intends to capture violent acts that affect not only the entire populations of the District or the United States, but also a substantial number of people within those populations, or entire subsets, discreet groups, or communities of people.   This would include, for example, violent acts that are meant to intimidate or coerce the District's Jewish or African American communities, either the entirety of those communities or a portion of them.   A further example of a significant portion of the population could be a portion of the community with an identifiable political association, for example, republicans or District-based supporters of a Palestinian state.

Council of the District of Columbia, Committee on the Judiciary Report, Subject: Bill

14-373, the "Omnibus Anti-Terrorism Act of 2002," p. 17 (April 4, 2002).

Here, the defendant's armed assault on the FRC and its employees constituted nothing less

than a direct attack on our democratic system, an essential component of which is the freedom of

persons and entities to engage in political speech and expression.   In that respect, the defendant's

act of terrorism clearly achieved one of its intended purposes—to inject fear into the hearts of

those associated with the FRC or its political causes and otherwise intimidate or coerce them from

openly participating in the democratic process.   By imposing a sufficiently severe sentence in this

case, the Court will be sending the appropriate message: namely, the use of violence as a means to

obtain political ends in the District of Columbia and the United States will not be tolerated.

### D.      The Need to Provide the Defendant with Educational or Vocational Training

The defendant does not appear to need such training.   In any event, the other factors

bearing on the seriousness of the offenses and the need for strong deterrence outweigh this element

in fashioning a just sentence.

**E.    The Need to Avoid Unwarranted Sentence Disparities Among Defendants with Similar Records Who Have Been Found Guilty of Similar Conduct**

The District of Columbia's Omnibus Anti-Terrorism Act (the "Act") was enacted in 2002. Since that time, this is the first case in which a defendant has been prosecuted and convicted for a violation of sections 3152 and 3153 of the Act ("Definitions" and "Acts of Terrorism; Penalties," respectfully).   Accordingly, there are no prior sentences available for direct comparison.   The below cases, however, are somewhat instructive.

In United States v. Gorbey, 54 A.3d 668 (D.C. 2012), the defendant was successfully prosecuted and convicted for, among other things, a violation of a different section of the Act, section 3154, which prohibits the manufacture or possession of a weapon of mass destruction.[11] Because the Gorbey case was prosecuted under the same Act and shares some factual similarities to this case, it is an appropriate case for comparison.

The essential facts of Gorbey, as articulated by the District of Columbia Court of Appeals, are as follows:

> On January 18, 2008, at about 1:00 p.m., a woman approached a United States Capitol Police ("USCP") Officer near the intersection of Delaware and D Streets, N.E., and told the officer that a man with a gun had asked her for directions to the United States Supreme Court.   From the USCP command center, an officer watched the video feed from surveillance cameras in the area around the U.S. Capitol and saw images of a man walking with a shotgun.   As shown on a recording from those cameras, USCP officers stopped and arrested the man—appellant Michael Gorbey—at the intersection of First and D Streets, N.E. At the time he was stopped, appellant had a shotgun in his hand and a sword on his back.   Twenty-seven shotgun shells were stored in the bulletproof vest he was wearing, and he also was in possession of hunting knives and a .45–caliber round, which officers found in the backpack he was carrying.   Appellant claimed that he was en route to a meeting with Chief Justice John Roberts of the United States

---

[11]   To our knowledge, other than this case and Gorbey, there are no other cases involving the successful prosecution of an offense delineated under the Act.

Supreme Court.

Minutes after appellant was stopped, USCP officers found a truck illegally [citation omitted] parked nearby and could see in it "heavy gauge wire coming out of [the] radio ... to the glove compartment ... [a]nd then ... coming out of the back of the vehicle," as well as "the stock of a rifle and a homemade bow and arrow" . . . [USCP officers ultimately] conducted a search of the inside of the truck (which was "in some disarray" from the disruptive tool).   They found ammunition on the floorboard of the passenger compartment but, during this initial search, they did not find an explosive device.   USCP officers found the keys to the truck in appellant's pocket and the certificate of title to the truck in the backpack appellant had been carrying at the time of his arrest.

The USCP officers moved appellant's truck to a secure storage area at 800 North Capitol Street, N.W., and, on February 8, 2008, conducted another search of the passenger compartment, pursuant to a search warrant.   After moving the passenger seat forward, officers found an object that one of the officers described as a "home-made bomb."   The object (hereafter referred to as the "device") consisted of "a metal can spray painted red" and "a clear bottle filled with what looked like lead pellets," and "everything was duct taped."   After the bomb squad used a tool to "disrupt" the device, officers completed a search of the passenger compartment and cab of the truck.   They recovered a "large amount" of black powder; firecrackers; lighters; primer or percussion caps; shotgun shells and shotgun cartridges; 550 rounds of long rifle ammunition; 200 rounds of other ammunition of various calibers; a rifle scope; and the (disrupted) components of the device (i.e., the metal can, duct tape, black powder, metal pellets, and glass fragments).

Appellant was charged and subsequently convicted, on May 16, 2008, of fourteen separate offenses in connection with the events described above: unlawful possession of a firearm by a convicted felon; two counts of carrying a dangerous weapon outside the home or business (shotgun and sword) ("CDW"); possession of an unregistered firearm ("UF"); eight counts of unlawful possession of ammunition ("UA"); manufacture, transfer, use, possession, or transportation of explosives for an unlawful purpose; [footnote omitted] and **attempted manufacture or possession of a weapon of mass destruction ("WMD")**.

Gorbey, 54 A.3d at 675-76.   For his crimes, the trial court sentenced Gorbey to an aggregate term of 264 months of imprisonment (i.e., 22 years).   The District of Columbia Court of Appeals affirmed the defendant's convictions and left undisturbed the trial court's aggregate sentence.

While Gorbey is somewhat instructive in that it represents the only other case prosecuted under the District of Columbia's Omnibus Anti-Terrorism Act, a significantly longer sentence is warranted in this case for many reasons.   First, whereas Gorbey involved the commission of D.C. Code offenses only, the defendant here is being sentenced for having also committed a serious federal firearms offense that, by itself, carries the recommended Sentencing Guideline of 10 years. More importantly, by comparison, the defendant's conduct and the specific charges in this case are substantially more egregious than that of Gorbey in every respect.

Unlike Gorbey, whose half-baked, armed appearance near the U.S. Supreme Court was destined to fail from the outset, the defendant methodically planned his crimes with a clear and obtainable objective in mind.   Over the course of more than a week, the defendant undertook and accomplished a variety of tasks necessary to his mission.   That planning allowed him to gain entry into the FRC, virtually unsuspected, and initiate his violent actions.   His overall purpose was clear and unwavering—to kill as many people at the FRC as he could and make a political statement in the process.   And, but for the quick actions of Mr. Johnson, he likely would have succeeded.

In recent cases where other defendants have committed or attempted to commit similar acts of terrorism involving a careful and deliberate plan to commit mass murder, many courts have given significantly lengthier sentences than in Gorbey.   These sentences reflect the need to punish those who seek to kill and terrorize significant portions of the civilian population, keep the populace safe, and deter others.   By way of example:

- On August 10, 2012, Naser Jason Abdo was sentenced in the United States District Court for the Western District of Texas to two consecutive life sentences plus sixty years for his unsuccessful plan to create and detonate a bomb inside a restaurant

frequented by soldiers from Fort Hood military base in Killeen, Texas, and to then shoot any survivors.   See Judgment, United States v. Abdo, Cr. No. 11-182 (W.D. Tex. August 10, 2012).   Abdo was arrested while in possession of a .40 caliber pistol and bomb-making instructions and components.

- On December 20, 2011, Kevin Harpham was sentenced in the United States District Court for the Eastern District of Washington to 32 years, the maximum allowed pursuant to the plea agreement, for planting a bomb along the parade route of a Martin Luther King Day parade in Spokane, Washington.   See Sentencing Memorandum, United States v. Harpham, Cr. No. 11-42 (E.D. Wash. December 27, 2011).   The device was discovered and disarmed without incident or injury. Id.

- Several recent cases involving FBI sting operations have also resulted in lengthy sentences.   On September 14, 2012, Amine El Khalifi was sentenced to 30 years in prison in the United States District Court for the Eastern District of Virginia for attempting to carry out a suicide bomb attack on the U.S. Capitol.   See Judgment, United States v. Khalifi, Cr. No. 12-37 (E.D. Va. September 14, 2012).   On April 6, 2012, Antonio Martinez was sentenced in the United States District Court for the District of Maryland to 25 years in prison for planning to detonate a bomb at an armed forces recruiting station.   See Judgment, United States v. Martinez, Cr. No. 10-798 (D. Md. April 6, 2012).   On May 9, 2011, Michael C. Finton was sentenced in the United States District Court for the Southern District of Illinois to 28 years in prison for driving what he believed to be a bomb to the federal courthouse in

Springfield, Illinois.   See Judgment, United States v. Finton, Cr. No. 10-30215

(S.D. Ill. May 9, 2011).   On October 28, 2010, Hosam Smadi was sentenced to 30

years in prison in the United States District Court for the Northern District of Texas

for his attempt to blow up a downtown Dallas skyscraper.   See Judgment, United

States v. Smadi, Cr. No. 09-294 (N.D. Tex. October 28, 2010).   In each of these

cases, the defendants were unwittingly working with undercover FBI employees,

and the public was never in any actual imminent danger.[12]

In addition, in this court, on June 29, 1995, United States District Judge Charles R. Richey

sentenced Francisco Duran to 40 years for his failed attempt to kill the President, in which Duran

drove across country, positioned himself in front of the White House with a semiautomatic assault

rifle under his trench coat, and then began firing in the direction of a tour group on the North lawn

until he was tackled by a bystander and later arrested.   See Judgment, United States v. Duran, Cr.

No. 94-447(D.D.C. June 30, 1995); see also United States v. Duran, 96 F.3d 1495, 1497 (D.C. Cir.

1996) (affirming conviction and summarizing facts of the case).

Significantly, in each of the above-referenced cases, nobody was harmed; nor, except for

Duran, were they ever in any immediate danger of being harmed.   For example, Gorbey's crimes

involved the mere possession or attempted possession of dangerous weapons and implements—he

was never accused or convicted of actually employing them in a violent manner (e.g., assault,

attempted assault, etc.).   In this case, however, the defendant intentionally shot and seriously

---

[12]   The government found only one recent FBI sting case that did not involve a longer sentence than that in Gorbey.
On November 1, 2012, Rezwan Ferdaus was sentenced in the United States District Court for the District of
Massachusetts to 17 years incarceration pursuant to a Rule 11(c)(1)(C) agreement for plotting an attack against the
Capital and Pentagon and attempting to provide detonation devices to terrorists.   The defendant was working with
FBI undercover employees, whom he believed were members of al-Qaeda.   See Judgment, United States v. Ferdaus,
Cr. No.11-10331 (D. Mass. November 1, 2012)

injured Mr. Johnson, who is still suffering from the physical and emotional effects of that tragic day.   Furthermore, by firing his weapon multiple times in an occupied lobby and shooting and injuring Mr. Johnson, the defendant achieved his broader purpose—to terrorize the FRC and its employees, including those who every day walk past the crime scene where they observed their co-worker and friend severely injured in the course of protecting their safety, as well as other like-minded individuals.

In sum, Mr. Johnson's actual pain and suffering, coupled with the emotional trauma endured by the FRC employees, must also be considered in fashioning any overall sentence that the defendant receives.   Accordingly, the Government submits that an aggregate sentence of 45 years for the defendant's three separate offenses would be consistent with and not disparate from those of similarly situated defendants.

### Conclusion

For the foregoing reasons, the Court should sentence the defendant as recommended in this memorandum.

Respectfully submitted,

RONALD C. MACHEN JR.
UNITED STATES ATTORNEY
D.C. Bar Number 447889


By:       _____/s/_____
T. Patrick Martin
Ann H. Petalas
Assistant United States Attorneys
D.C. Bar Number 471965 (TPM)
Texas Bar Number 24012852 (AHP)
National Security Section
United States Attorney's Office
  for the District of Columbia